UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

MICHAEL MARCAVAGE and
STEVEN C. LEFEMINE,                                    05 CV 4949 (RJS)(JCF)

                    Plaintiffs,

            -versus-

THE CITY OF NEW YORK, ET AL.                          ECF CASES

                    Defendants.

-----------------------------------------------------------x

### DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

Defendants submit that, based upon the factual record in this case, the following facts are undisputed as contemplated by Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York:[1]

### Facts Related To Security, Public Safety And Traffic Flow Concerns Around MSG

1.      The Republican National Convention ("RNC" or "Convention") was held at Madison Square Garden ("MSG") from Monday, August 30, 2004 through Thursday, September 2, 2004.  Declaration of Bruce Smolka ("Smolka Dec.") (Exhibit E) at ¶ 2.

2.      The NYPD was the lead local law enforcement agency with responsibility for security and public safety during the Convention.  Smolka Dec. at ¶ 2.

3.      The NYPD began preparing and planning for the Convention in early 2003 and continued up and through the Convention.  Smolka Dec. at ¶ 2.

---

[1] To the extent that defendants have construed the facts for purposes of this motion in the light most favorable to the plaintiffs, defendants reserve their rights to put in evidence and argue otherwise in the event of any trial and for any purposes other than this motion.

4.      Among other responsibilities, Chief Smolka was co-chair of the Site Security Committee.  Smolka Dec. at ¶ 3.

5.      The Site Security Committee was responsible for a variety of security and planning issues including security and planning in and around MSG.  Smolka Dec. at ¶ 3.

6.      MSG is situated in midtown Manhattan and occupies the entire area from 31st Street to 33rd Street and from 7th Avenue to 8th Avenue.  Smolka Dec. at ¶ 4.

7.      The NYPD anticipated that the sheer size of the RNC event would place a tremendous strain on the department's resources and severely impact vehicular and pedestrian traffic flow throughout the City and in and around MSG. Smolka Dec. at ¶ 4.

8.      That part of Manhattan, particularly the streets, avenues and walkways in the immediate vicinity of MSG, is extremely congested with both vehicle and pedestrian traffic on a routine basis.  Smolka Dec. at ¶ 5.

9.      The condition is particularly acute when there is a major event at MSG, which can add thousands of additional pedestrians to the walkways in that immediate vicinity. Smolka Dec. at ¶ 5.

10.     In addition, MSG sits atop Pennsylvania Station ("Penn Station"), through which up to 1300 trains run on a daily basis.  They include Amtrak trains that run north and south between major cities along the eastern seaboard; the Long Island Railroad, which provides service to all of Long Island; New Jersey Transit rail lines servicing New Jersey and other regions; and the Seventh and Eighth Avenue New York City subway lines.  Smolka Dec. at ¶ 6.

11.     Up to 600,000 riders enter Penn Station each day.  Smolka Dec. at ¶ 6.

12.     Thus, from a security and policing standpoint, MSG and Penn Station offered unique challenges and vulnerabilities.  Smolka Dec. at ¶ 6.

2

13.     Furthermore, the NYPD anticipated that New York City (the "City") would see a volume of protest activity not seen in decades.  Smolka Dec. at ¶ 7.

14.     NYPD had information that potentially hundreds of thousands of protesters would come to the City to protest the Convention.  Smolka Dec. at ¶ 7.

15.     Organizers of the United for Peace and Justice anti-war march predicted that 250,000 people would participate in their march and rally alone.  Smolka Dec. at ¶ 7.

16.     The NYPD also anticipated that individuals with opposing viewpoints would seek to express their messages.  Smolka Dec. at ¶ 7.

17.     As the main venue for the RNC, the NYPD expected that MSG would be the location for large-scale protests and demonstrations.  Smolka Dec. at ¶ 7.

18.     The City and the NYPD welcomed those seeking to exercise their First Amendment rights and sought to facilitate the exercise of those rights regardless of viewpoint. Smolka Dec. at ¶ 8.

19.     In order to facilitate planned protest events and accommodate other types of protest activities in and around the MSG area, part of the NYPD operational plan included the creation of a demonstration area beginning at 31st Street and 8th Avenue (directly adjacent to the southwest corner of MSG).  Smolka Dec. at ¶ 8.

20.     The area encompassed the entire width of the roadway of 8th Avenue and was designed to extend as far south as necessary to accommodate large numbers of demonstrators. Smolka Dec. at ¶ 8.

21.     Several events were planned during the week of the RNC in this demonstration area. Smolka Dec. at ¶ 8.

22.     The NYPD issued a number of sound permits for these events and also arranged for the placement of a stage at the northern end of the demonstration for any group that chose to use it during an event or protest.  Smolka Dec. at ¶ 8.

23.     In addition, individuals wishing to exercise their First Amendment rights, regardless of viewpoint, could do so at any time during the RNC within the demonstration area. Smolka Dec. at ¶ 8.

24.     In one instance, a large group of several thousand individuals who had previously not applied for or requested a parade permit were escorted by NYPD from Dag Hammerskold Plaza near the United Nations across Manhattan and into the demonstration area. Smolka Dec. at ¶ 8.

25.     To create the demonstration area at that location, the NYPD blocked off vehicle traffic on 8th Avenue (a main vehicle thoroughfare) in midtown.  Smolka Dec. at ¶ 9.

26.     To assure that everyone who wished to exercise their First Amendment rights in the demonstration area could do so, NYPD officers constantly monitored and were prepared to expand that zone on short notice by blocking off additional blocks of 8th Avenue. Smolka Dec. at ¶ 9.

27.     In fact, the demonstration area was used by thousands of individuals during the RNC.  Smolka Dec. at ¶ 9.

28.     The NYPD actively sought to assure that the demonstration area was safe for anyone who sought to express himself or herself regardless of viewpoint.  Smolka Dec. at ¶ 10.

29.     The demonstration area was monitored constantly by officers to assure that individuals assembled there could express themselves without concern that other individuals

in the area (who may have had differing views) would retaliate or take other action against them. Smolka Dec. at ¶ 10.

30.     In addition, the NYPD understood that political conventions are potential terrorist targets and had to prepare for the possibility of groups and individuals who sought to engage in criminal conduct that could significantly endanger public safety.  Smolka Dec. at ¶ 11.

31.     Because MSG was the main venue for the RNC, and NYPD expected that it would be a main object of protest and demonstration activity, a variety of security measures were required in and around MSG.  Smolka Dec. at ¶ 11.

32.     The purpose of the security measures taken in the vicinity of MSG was, among other things, to protect the President, Vice President, and numerous others who attended the Convention.  Smolka Dec. at ¶ 12.

33.     As many as 50,000 people were expected to participate including approximately 2509 delegates, 2344 alternates, 15,000 members of the media/press, 15,000 donors, governors, congressional delegations and staff, and 15,000 family, friends and other RNC visitors.  Smolka Dec. at ¶ 12.

34.     In addition, the NYPD was responsible for ensuring the safety of the City's own citizens, its visitors, and its buildings and property, while at the same time minimizing inconvenience to commuters, businesses and residents in the vicinity of MSG. Smolka Dec. at ¶ 12.

35.     To assure security, the NYPD implemented a series of security zones around MSG that allowed for control of ingress and egress as well as the quick closure of the area in the event of a catastrophic incident.  Smolka Dec. at ¶ 13.

36.     Pedestrian traffic both within and in the vicinity outside MSG was restricted in various ways.  Smolka Dec. at ¶ 13.

37.     For instance, two of the entrances to Penn Station (at 31st Street and 8th Avenue and at 33rd Street and 8th Avenue) were closed in their entirety.  Smolka Dec. at ¶ 13.

38.     In addition, the NYPD implemented a "frozen zone" that prohibited pedestrian traffic on the west sidewalk of 7th Avenue between 31st Street and 33rd Street.  Smolka Dec. at ¶ 13.

39.     Barriers were erected along the 7th Avenue curb line, on the west side of the avenue, to assist enforcement of this prohibition.  Smolka Dec. at ¶ 13.

40.     The NYPD also implemented a "no-standing" restriction on the east sidewalk of 7th Avenue between 31st and 33rd Street.  Smolka Dec. at ¶ 14.

41.     On the east sidewalk of 7th Avenue between 31st and 33rd Street, pedestrians were permitted to walk but were required to keep moving and not to congregate.  Smolka Dec. at ¶ 14.

42.     That requirement was intended to keep those streets and sidewalks free from congestion, promote the public safety, and minimize the inconvenience to commuters, businesses and residents.  Smolka Dec. at ¶ 14.

43.     Between 31st Street and 33rd Street, pedestrians were not permitted to step into the street or to cross 7th Avenue, except at the intersection of 32nd Street and 7th Avenue.  Smolka Dec. at ¶ 15.

44.     Barriers were erected along the 7th Avenue curb line, on the east side of the avenue, to assist enforcement of this prohibition.  Smolka Dec. at ¶ 15.

45.     At the 32nd Street intersection, a crosswalk remained open that allowed entry to and exit from MSG and Penn Station.  Smolka Dec. at ¶ 15.

46.     Several subway lines also discharged passengers through exits at that intersection.  Smolka Dec. at ¶ 15.

47.     At the crosswalk across 7th Avenue at 32nd Street, pedestrians were permitted to walk but were required to keep moving and not to congregate. Smolka Dec. at ¶ 15.

48.     Because of the various closures to ingress and egress to and from Penn Station and MSG, and for the other reasons discussed above, the 32nd Street approach to Penn Station and MSG became the primary point of ingress and egress to that venue for thousands of pedestrians and commuters on a daily basis.   Smolka Dec. at ¶ 16.

49.     Thus, it was critically important to keep that artery of pedestrian traffic, and the adjacent pedestrian walkways that served it, fully open and unimpeded.  Smolka Dec. at ¶ 16.

50.     The restrictions discussed above, including the limitation on standing on the sidewalk of Seventh Avenue between 31st and 33rd Streets, and standing in the crosswalk at 32nd Street, were implemented only during the period of the 2004 Convention.  Smolka Dec. at ¶ 17.

**Facts Related To Warnings To Plaintiffs**
**And Their Arrests On September 1, 2004**

51.     Plaintiffs Marcavage and Lefemine are evangelical ministers from Pennsylvania and South Carolina.  Deposition of Michael Marcavage ("Marcavage Depo.") (Exhibit F) at 48:4-8, 54:23;  Deposition of Steven Lefemine ("Lefemine Depo.") (Exhibit G) at 4:12, 12:22, 89:19.[2]

52.     Their ministry generally includes "spreading the truth about abortion and sharing the gospel of Jesus Christ" as well as ministering on subjects such as "atheism,

---

[2] Plaintiff Marcavage testified that he and plaintiff Lefemine prepared together for their depositions with their counsel.  Marcavage Depo. at 178:15.  Plaintiff Lefemine then attended plaintiff Marcavage's deposition, took notes, and reviewed those notes prior to his own deposition the following day.  Lefemine Depo. at 11-12.

homosexuality, evolution, just a variety of things that people have questions about."   Plaintiff

Marcavage characterized their ministry as "anti-sin."   Marcavage Depo. at 7-8.

53.    Captain Staples retired as Captain with the New York City Police

Department ("NYPD") in 2006 after 26 years of service.   Declaration of Gerard Staples ("Staples

Dec.") (Exhibit H) at ¶ 1.

54.    Captain Staples was employed by the NYPD for over 23 years, and had

been a Captain for 7 years, on September 1, 2004.   Deposition of Gerard Staples ("Staples

Depo.") (Exhibit I) at 17:8-11, 19:1.

55.    On September 1, 2004, Captain Staples was assigned to patrol the

perimeter of MSG and was responsible for the supervision of other officers in that area including

officers responsible for security and crowd control.   Staples Depo. at 30-32; Staples Dec. at ¶ 2.

56.    Sergeant Richard Crespo was assigned the southeast side of 7th Avenue

between 31st and 32nd Street during the 2004 RNC.   Deposition of Richard Crespo ("Crespo

Depo.") (Exhibit J) at 22:10-16.

57.    P.O. Chris Serrao was assigned to work between 33rd and 32nd Street on 7th

Avenue.   Deposition of Chris Serrao ("Serrao Depo.") (Exhibit K) at 10:19-25.

58.    Police Officer Dawn Gavin also was assigned to work on September 1,

2004.   Deposition of Dawn Gavin ("Gavin Depo.") (Exhibit L) at 12:21-25, 13:2-8.

59.    In preparation for the 2004 RNC, officers were told that pedestrians were

not allowed to block either vehicular or pedestrian traffic.   Deposition of Kenji Ebanks ("Ebanks

Depo.") (Exhibit M) at 19:12-24.

60.    Officers were told that those wishing to exercise their First Amendment

rights had a staging area in the vicinity of 31st and 8th Avenue, which many officers colloquially

referred to as a "demonstration area" or "free speech zone." Staples Depo. at 47:21; Serrao Depo. at 27:3-9; Ebanks Depo. at 19:12-24.

61.   Officers were instructed to tell people who desired to engage in demonstration or other free speech activity that they could do so at the designated area at 31st and 8th Avenue." Staples Depo. at 49:20-23.

62.   The sidewalk between 32nd Street and 33rd Street along the East side of 7th Avenue was considered an extended part of the "frozen zone." Serrao Depo. at 23-24.

63.   The police implemented heightened restrictions on the sidewalk between 32nd Street and 33rd Street along the East side of 7th Avenue because of its proximity to the frozen zone. Crespo Depo. at 58:22-59:7.

64.   Officers were instructed that pedestrians were not permitted to stop on the sidewalk between 32nd Street and 33rd Street along the East side of 7th Avenue on September 1, 2004 and to make sure that pedestrian traffic kept flowing at that location. Staples Depo. at 43:1-4; Serrao Depo. at 23-24; Gavin Depo. at 19-20; Deposition of Brian Donnelly ("Donnelly Depo.") (Exhibit N) at 38:6-23; Ebanks Depo. at 31:11-17; Deposition of Michelle Burke ("Burke Depo.") (Exhibit O) at 45:13-48:2.

65.   Officers were instructed that pedestrians could not stop because it could lead to a build-up of pedestrian traffic at that location. Donnelly Depo. at 48:5-18.

66.   Officers were instructed that, if pedestrians were stopped, and instructions were given to them to move along, and those individuals did not comply, the individuals were subject to arrest. Donnelly Depo. at 41:17- 42:2.

67.   Immediately prior to their arrival in front of MSG on Wednesday, September 1, 2004, plaintiffs spent a few hours ministering in a park in the Greenwich Village neighborhood of Manhattan. Marcavage Depo. at 65:5-66:20.

68.     At that location, "there were people gathering around talking to us" and plaintiffs were "having a debate over [their] teachings." Marcavage Depo. at 67.

69.     Members of the police department ordered plaintiffs to disperse from that location. Marcavage Depo. at 67:24, 77:9.

70.     Plaintiffs refused to disperse. Marcavage Depo. at 68:3, 77:14.

71.     Plaintiff Marcavage testified that "We stayed there. It was obvious that we did not leave." Marcavage Depo. at 68:8.

### At The Madison Square Garden Location

72.     Later that day, during the Convention at MSG, plaintiffs Marcavage and Lefemine were standing on the public sidewalk in front of the Pennsylvania Hotel, on the east side of Seventh Avenue, between 32nd and 33rd Streets, across the street from MSG. Complaint at ¶ 15; Marcavage Depo. at 69:16, 79:24.

73.     At that location, plaintiffs were standing together and each plaintiff carried a large sign with him. The approximate dimensions of the signs were 4 feet by 6 feet; and 3 feet by 5 feet. Marcavage Depo. at 69:20-70:13; 73:6; Lefemine Depo. at 39:8, 118:15.

74.     Plaintiffs stood in that location for between 10 and 15 minutes before being approached by officers. Lefemine Depo. at 131:16.

75.     At that time, Captain Staples was on duty and "monitoring the traffic flow and activity in the area" of MSG. Staples Depo. at 53:17-18.

76.     Captain Staples observed "a large flow of traffic coming out of Penn Station from the West side of 7th Avenue crossing the street to go [] Eastbound on 32nd [Street]." Staples Depo. at 54:8-11, 62:25, 64:14.

77.     In the time that plaintiffs were in that area, "there were hundreds upon hundreds of people walking up and down the sidewalk" and "there may have been thousands [of people] that [they] viewed in that area." Marcavage Depo. at 80:16, 82:25, 97:3.

78.     Captain Staples considered that location to be part of the exit to Penn Station and part of the exit out of the subway system on that day.  Staples Depo. at 87:13, 88:17, 88:21.

79.     According to plaintiff Lefemine, "this was a busy place[.]"   Lefemine Depo. at 133:25.  "We were very close to where the pedestrians come out of the Penn Station entrance over on the 7th Avenue side near that corner of 32nd and 7th Avenue; right in that vicinity. People [were] going all over the place around us." Lefemine Depo. at 161:7-11.

80.     There was a higher number of people than normal walking in that area, which was "a major pedestrian thoroughfare." Gavin Depo. at 56-58.

81.     Plaintiffs were "attempting to establish [themselves] there so [they] would be able to hand out information to the hundreds and hundreds of people traveling up and down the sidewalk." Marcavage Depo. at 83:21-84:2.

82.     Plaintiffs carried their literature with them (and each carried a tape recorder).  Marcavage Depo. at 63:5, 63:13, 74:18-22; Lefemine Depo. at 118:22, 120:21.

83.     While standing at that location, they "may have offered literature to people[.]" Lefemine Depo. at 131:20, 135:14.

84.     Plaintiffs also intended to engage the passersby in conversation at that location.  In particular, plaintiffs intended "[to] speak to people concerning what the word of God teaches with regards to abortion." Marcavage Depo. at 63:2, 84:12.

85.     Plaintiffs could not recall any other individuals who were standing in that area; nor any other individuals ministering in that area; nor any individuals protesting or

demonstrating in that area; nor any other individuals carrying signs in that area.  Marcavage
Depo. at 81:8-17, 115:4; Lefemine Depo. at 137:11-138:2.

### Interaction Between Plaintiffs And Police

86.     Plaintiffs were approached by uniformed members of the New York
Police Department ("NYPD"), who advised plaintiffs that they were in a "frozen zone" and
repeatedly directed plaintiffs to leave that area.   Complaint at ¶¶ 17-21; Plaintiffs' Audio
Recording (Exhibit P); Transcript of Plaintiffs' Audio Recording (Exhibit Q);[3] Marcavage Depo.
at 82:15, 87:4, 88:17, 91:20.

87.     When P.O Serrao first observed the plaintiffs, they were close to the curb
along 7th Avenue, speaking with other officers.  Serrao Depo. at 34:14-19, 62:5-11.

88.     P.O. Serrao overheard the conversation between plaintiffs and the other
officers, observed that plaintiffs were not complying with orders, and specifically heard the
plaintiffs "asking the same question over and over again about, you know, why can't we stand
here, why can't we do this."  Serrao Depo. at 34:20-35:6.

89.     P.O. Serrao told plaintiffs they were not allowed to stand there.  Serrao
Depo. at 35:14-20.

90.     P.O. Serrao identified himself on the audio recording saying: "There's a
Sergeant right here," "You guys got to go," and "You can't stay here."  Serrao Depo. at 45:14-
18; Transcript of Plaintiffs' Audio Recording.

---

[3] The Transcript of Plaintiffs' Audio Recording was prepared by defendants based upon a review
of the audiotape produced to defendants by the plaintiffs.  The identities of the speakers was
determined by defendants based, in part, upon deposition testimony provided in this case.

91.     Plaintiffs twice sought to "appeal" the officers' orders to other members of the NYPD and the officers twice assented to those requests.  Transcript of Plaintiffs' Audio Recording; Marcavage Depo. at 88:18, 97:13.

92.     Plaintiffs were permitted to "appeal" the matter first to Community Affairs Officer Kenji Ebanks and then to Captain Gerard Staples.  Transcript of Plaintiffs' Audio Recording; Marcavage Depo. at 97:13, 111:3-6.

93.     It is the plaintiffs' "standard practice" to appeal such matters to a higher-ranking officer.  Plaintiff Lefemine testified that "When an officer -- you know, a street level, patrol level officer gives us an instruction, that is unconstitutional, we try to appeal to a higher person that might understand the law."  Lefemine Depo. at 168:4-8.

94.     The officers, including P.O. Ebanks, walked plaintiffs south on the sidewalk, to 32nd Street, then crossed to the southeast corner of 32nd Street and 7th Avenue, while discussing the matter with plaintiffs.  Marcavage Depo. at 96:12-18, 104:10.

95.     P.O. Ebanks advised plaintiffs that they must leave the restricted zone; and that they could continue their expressive activities by moving to a "free speech zone" approximately one block west and one block south (31st Street and 8th Avenue) of where they were standing.  Complaint at ¶¶ 22, 24; Transcript of Plaintiffs' Audio Recording; Marcavage Depo. at 91:17, 105:14.

96.     The southwest corner of MSG directly abuts the demonstration area at the corner of 31st Street and 8th Avenue to which the plaintiffs were directed by the officers.  The Court may take judicial notice of this fact.  For the Court's convenience, defendants submit a map depicting the streets in the immediate vicinity of MSG (Exhibit R).

97.     P.O. Ebanks advised the plaintiffs that they would be within sight and sound of the Convention at 31st and 8th Avenue and asked the plaintiffs "Isn't that close?" Transcript of Plaintiffs' Audio Recording.

98.     Plaintiffs understood that P.O. Ebanks wanted them to leave the area. Complaint at ¶¶ 24-25; Transcript of Plaintiffs' Audio Recording; Marcavage Depo. at 94:20; Lefemine Depo. at 146:7, 164:5.

99.     But plaintiffs objected to the Sergeant's direction that they do so and his suggestion that they continue their expressive activities in the "free speech zone." Complaint at ¶¶ 24-25; Transcript of Plaintiffs' Audio Recording; Marcavage Depo. at 94:20.

100.    Plaintiffs asked P.O. Ebanks, "So what do you think about the First Amendment being just trampled because of these particular things that you call frozen zones? Do you have any comment on that?" Complaint at ¶ 23; Transcript of Plaintiffs' Audio Recording; Marcavage Depo. at 105:2.

101.    Plaintiffs objected that "you can't just lump us all together [in the demonstration area]; [t]here's different people with different views; we don't want to be just thrown in a big area where everyone else has different opinions; we want to be able to express ourselves [in] separate areas in separate locations." Complaint at ¶ 24; Transcript of Plaintiffs' Audio Recording; Marcavage Depo. at 105:14.

**Interaction Between Plaintiffs And Captain Staples**

102.    Captain Staples observed the plaintiffs "[make] their way to the Southeast corner of 32nd Street and 7th Avenue." Staples Depo. at 58:25.

103.    When Sgt. Crespo first observed the plaintiffs, they were in the middle or closer to the crosswalk on the southeast corner of 32nd Street and 7th Avenue. Crespo Depo. at 33-35.

104.    Captain Staples observed that plaintiffs "were stopped on the corner and holding up placards, signs; and persons trying to exit the subway system going Eastbound had to walk around them." Staples Depo. at 60:3-6.

105.    Captain Staples observed that the plaintiffs' signs were "approximately four feet wide and maybe five feet in height." Staples Depo. at 62:22; Marcavage Depo. at 69:20-70:13; 73:6; Lefemine Depo. at 39:8, 118:15.

106.    Captain Staples observed that plaintiffs "were spaced almost shoulder to shoulder." Staples Depo. at 62:23-25.

107.    Captain Staples observed that "there was no other way for people to leave that area" than to pass by where plaintiffs were standing. Staples Depo. at 88:12.

108.    Plaintiffs "were blocking the entrance onto the sidewalk from the street" and were impeding the flow of pedestrians on the crosswalk. Staples Depo. at 60:11-13, 62:23-25; Gavin Depo. at 47-48; Crespo Depo. at 34:18-35:9; Donnelly Depo. at 11:17-13:12.

109.    Captain Staples determined that plaintiffs were violating the "no standing" rule and blocking pedestrian traffic. Staples Dec. at ¶ 4.

110.    Captain Staples "was told [by the Community Affairs officer] that [plaintiffs] would not leave." Staples Depo. at 63:4.

111.    Captain Staples observed that plaintiffs were provided numerous warnings and ample opportunity to disperse. Staples Dec. at ¶ 4.

112.    Captain Staples approached the plaintiffs and "was within conversational range" of a few feet. Lefemine Depo. at 169:14.

113.    Captain Staples affirmed the orders of the other officers and repeatedly directed the plaintiffs to leave the restricted zone immediately. Complaint at ¶ 25; Transcript of Plaintiffs' Audio Recording; Marcavage Depo. at 109:22.

114.    Captain Staples also advised plaintiffs at least once that "Right now you're blocking traffic with the sign."  Transcript of Plaintiffs' Audio Recording; Marcavage Depo. at 159:10-12; Staples Depo. at 59:18-20, 63:5-24, 66-67:13; Gavin Depo. at 47:20-24.

115.    Sgt. Crespo heard Captain Staples tell the plaintiffs that they had to leave, and that if they did not leave, they would be arrested.  Crespo Depo. at 35:22-25.

116.    Plaintiffs had no difficulty hearing the Captain.    Lefemine Depo. at 169:25.  Plaintiff Lefemine testified, in particular, that "I think I remember someone saying that [you are blocking pedestrian traffic]."  Lefemine Depo. at 171:6-8.

117.    In all, no fewer than three officers, including P.O. Ebanks and Captain Staples, ordered plaintiffs to leave the restricted zone both before and after permitting plaintiffs an opportunity "to appeal" the matter up the chain of command.    Complaint at ¶¶ 17-25; Transcript of Plaintiffs' Audio Recording; Marcavage Depo. at 104:24-105:2.

118.    Captain Staples "instructed [plaintiffs] several times [] that if they want to show their signs [], that they were to go to 31st and [8th Avenue] where there was an area where people could congregate."  Staples Depo. at 63:8-10, 64:15-18.

**Recorded Warnings And Instructions To Plaintiffs**

119.    Plaintiffs were ordered to leave the restricted zone and advised that they could continue their expressive activities at the nearby demonstration area no fewer than 17 times before their arrests.  Transcript of Plaintiffs' Audio Recording; Marcavage Depo. at 149:3-8, 151:9.

120.    The orders were given in the following terms: "You can't be right here; You can't; You can't; Not at all; Not right here; Not today; You can't; You can't be protesting out here; [You can go to] 8th Avenue; 31st and 8th Avenue; [8th and] 31st; Okay, so just go now; You have to go – you have to go now; You have to leave this area; You have to leave this area

16

now; Right now you have to leave."  Transcript of Plaintiffs' Audio Recording (Exhibit Q);
Marcavage Depo. at 149:3-8, 151:9.

121.     Plaintiffs did not leave.  Complaint at ¶ 25; Lefemine Depo. at 164:7.

122.     Captain Staples personally observed that plaintiffs made no movement to
comply with those orders.  Staples Dec. at ¶ 4; Gavin Depo. at 47:20-24.

### Plaintiffs' State Of Mind

123.     Based upon the foregoing facts and circumstances, Captain Staples made
the assessment that plaintiffs had no intention to comply with the officers' orders.  Staples Dec.
at ¶ 4.

124.     Plaintiff Marcavage confirmed that his desire was not to comply with the
officers' orders but "to continue a discussion."  Marcavage Depo. at 113:6.

125.     Plaintiffs "continued [a] discussion that was just not being abandoned [by
them]."  Marcavage Depo. at 109:23-110:2.

126.     Plaintiff Lefemine explained that "[the police] were wanting us to leave
the area and we were wanting to continue the discussion."  Lefemine Depo. at 171:22, 173:8-10.

127.     Plaintiff Lefemine "[tried] to determine from the officer, where is he at in
terms of telling us to leave; are we risking arrest. . . . I wanted to learn from Captain Staples are
we at a place that if we do not obey your instruction to leave, are we at a place where you are
threatening us with arrest[.]"  Lefemine Depo. at 159:1-8.

128.     After they were told to leave and after they were told they were blocking
pedestrian traffic, "[they] could have left.  That would have been our own choice – our own
freedom of movement[.]"  Lefemine Depo. at 173:14-19, 176:20.

129.     Plaintiff Lefemine "chose not to leave the area" and "elected to stay there
in the presence of the police."  Lefemine Depo. at 171:24, 172:24.

**Arrests Of Plaintiffs**

130.    Captain Staples ordered the arrests of plaintiffs Marcavage and Lefemine thereafter.  Complaint at ¶ 25; Marcavage Depo. at 118:21; Staples Dec. at ¶ 4.

131.    "[The] decision to make the arrest was sooner than [plaintiffs] had assessed[.]"  Lefemine Depo. at 172:7.

132.    When plaintiffs advised Captain Staples that "[they] were not intending to get arrested," Captain Staples twice apologized by saying "I'm sorry."  Transcript of Plaintiffs' Audio Recording.

133.    Sgt Crespo was assisted in the arrests by Officer Donnelly.  Staples Depo. at 69-70.

134.    Captain Staples observed plaintiff Marcavage "wiggle[] and wiggle[] and drop[] to his knees" "when [the officers] approached to arrest him."  Staples Depo. at 81:13-82:2, 83:1-3; Crespo Depo. at 44:8-20.

135.    Upon being placed in handcuffs, plaintiff Marcavage sat down "in protest."  Marcavage Depo. at 121:19.

136.    The police had to lift Marcavage off the ground.  Crespo Depo. at 44:21-25.

137.    Captain Staples was not involved in any other arrests during the 2004 RNC.  Staples Depo. at 72-73.

138.    By his own account, plaintiff Lefemine has been arrested between 20 and 30 times, and has been convicted between 10 and 20 times, in connection with conduct substantially similar to the conduct in which he engaged on September 1, 2004.  Lefemine Depo. at 58:3-6, 28- 88.

139.    Among his other convictions, plaintiff Lefemine previously has been convicted of obstructing government administration in New York.  Lefemine Depo. at 81-83.

140.    By his own account, plaintiff Marcavage has been arrested at least seven times, and has been convicted at least once, in connection with conduct substantially similar to the conduct in which he engaged on September 1, 2004.  Marcavage Depo. at 19:4, 24:2, 27:2, 31:5, 181:25, 182:9, 189:19, 193:10, 195:16.

### Facts Related To Charges And Dispositions

141.    For his conduct on September 1, 2004, plaintiff Marcavage was charged with disorderly conduct and resisting arrest.  Complaint at ¶ 34; Marcavage Depo. at 144:2; Criminal Court Complaint of Michael Marcavage (Exhibit S).

142.    The charges against plaintiff Marcavage were dismissed.  Marcavage Depo. at 144:22; Certificate of Disposition of Michael Marcavage (Exhibit T).

143.    Plaintiff Lefemine was charged with disorderly conduct. Complaint at ¶ 34; Criminal Court Complaint of Steven Lefemine (Exhibit U)

144.    Plaintiff Lefemine accepted an ACD.   Lefemine Depo. at 187:13; Certificate of Disposition of Steven Lefemine (Exhibit V).

### Facts Related To First Amendment, Equal Protection And Other Issues

145.    Plaintiffs could not recall any other individuals who were standing in that area; nor any other individuals ministering in that area; nor any individuals protesting or demonstrating in that area; nor any other individuals carrying signs in that area.  Marcavage Depo. at 81:8-17, 115:4; Lefemine Depo. at 137:11-138:2.

146.    At his deposition, plaintiff Marcavage testified that he has "no idea" why he was arrested.  Marcavage Depo. at 145:11.

147.    At his deposition, plaintiff Marcavage could not recall whether any of the officers said anything "pertaining to the contents of [plaintiffs'] speech." Marcavage Depo. at 161:7.

148.    At his deposition, plaintiff Lefemine could not recall whether any officers made any remarks about the content of his speech. Lefemine Depo. at 173:24.

149.    Both plaintiffs have continued to exercise their First Amendment rights since their arrests on September 1, 2004. Marcavage Depo. at 182, 189, 196; Lefemine Depo. at 88.

150.    Plaintiff Marcavage was arrested again in October 2004, October 2005, and July 2006 while exercising his First Amendment rights on the subjects of abortion and homosexuality. Marcavage Depo. at 182, 189, 196.

151.    Plaintiff LeFemine has been ministering on the street three or four times per week since 2004. Lefemine Depo. at 88.

152.    Plaintiffs objected that "you can't just lump us all together [in the demonstration area]; [t]here's different people with different views; we don't want to be just thrown in a big area where everyone else has different opinions; we want to be able to express ourselves [in] separate areas in separate locations." Complaint at ¶ 24; Transcript of Plaintiffs' Audio Recording; Marcavage Depo. at 105:14.

153.    Neither plaintiff sustained any physical injury and neither plaintiff was treated for any emotional distress in connection with the incidents of which they complain in this case. Marcavage Depo. at 11:22, 15:23, 140:16; Lefemine Depo. at 14:3.

154.    Plaintiff Marcavage confirmed that the audio recording submitted to the Court as Exhibit P (from which the transcript of the recording was made (Exhibit Q)), accurately represents what was said during the incident. Marcavage Depo. at 156:19.

Dated: New York, New York
        December 1, 2008

                                    Respectfully submitted,

                                    MICHAEL A. CARDOZO
                                    Corporation Counsel of the  City of New York
                                    Attorneys for Defendants
                                    100 Church Street, Room 3-130
                                    New York, New York 10007
                                    212.788.8026 (ph)
                                    212.788.9776 (fax)

                     By:            _____
                                    James Mirro, Esq.
                                    Alexis L. Leist, Esq.
                                    Cheryl L. Shammas, Esq.
                                    Special Federal Litigation Division