**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------X
**MICHAEL MARCAVAGE and**
**STEVEN C. LEFEMINE,**                             **05 CV 4949 (RJS) (JCF)**

                                   **Plaintiffs,**     **PLAINTIFFS' RESPONSE TO**
                                                       **DEFENDANTS' STATEMENT OF**
            **v.**                                     **UNDISPUTED FACTS**

**THE CITY OF NEW YORK , ET AL.**                   **ECF CASES**

**Defendants.**
-----------------------------------------------------X

### PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS.

Plaintiffs submit the following response to the Defendants' Statement of Undisputed Facts in Support of their Motion for Summary Judgment.[1]  Plaintiffs contend that the record contains disputed facts that are material to the issues in this case and that the Defendants' omitted significant material facts in this case that Plaintiffs address herein.

### PUBLIC SAFETY AND TRAFFIC FLOW AROUND MADISON SQUARE GARDEN.

1.      It is undisputed that the Republican National Convention (RNC) was held at Madison Square Garden (MSG) from Monday, August 30, 2004, through Thursday, September 2, 2004.

2.      It is undisputed that the New York Police Department (NYPD) was the lead local law enforcement agency with responsibility for security and public safety during the RNC.

3.      It is undisputed that the NYPD began preparing and planning for the RNC in 2003 and continued for the duration of the convention.

4.      It is undisputed that former Chief of Police Bruce Smolka was the co-chair of the Site Security Committee.

---

[1] All citations to Deposition Testimony and Declarations are to the Defendants' Exhibits in their Statement of Undisputed Facts.

1

5.      It is undisputed that the Site Security Committee was responsible for a variety of security and planning issues including security and planning in and around MSG.

6.      It is undisputed that MSG is situated in midtown Manhattan, however Plaintiffs dispute the Defendants' claim that MSG occupies the entire area from 31st Street to 33rd Street and from 7th Avenue to 8th Avenue, because it does not occupy the entire area and shares a significant portion of this space with the entrance to Pennsylvania Station (Penn Station) on the eastern side of the block.  *See* a true and accurate map of Madison Square Garden and Pennsylvania Station is attached to the Declaration of Brian W. Raum, Ex. A (Plaintiffs' Exhibit A, MSG and Penn Station Map).

7.      It is undisputed that the NYPD anticipated that a significant number of people would attend the RNC and that as a result, the pedestrian and vehicular traffic would increase throughout the City and in and around MSG.  The Defendants however, have presented no evidence that during the RNC there was any more pedestrian traffic in and around MSG and Penn Station than on any other day or when there is any other event at MSG.

8.      It is undisputed that parts of Manhattan, particularly the streets, avenues, and walkways in the immediate vicinity of MSG, are extremely congested with both vehicle and pedestrian traffic on a routine basis, but Defendants have presented no evidence to support any claim that this was any different during the RNC or any other event at MSG.

9.      It is undisputed that the conditions are particularly acute when there is a major event at MSG, which can add thousands of additional pedestrians to the walkways in that immediate vicinity.  Plaintiffs add however, that this condition is typical for the area surrounding MSG and Penn Station as Defendants' concede in paragraph 10 below.

10.     It is undisputed that MSG sits atop Penn Station, through which up to 1,300 trains run on a daily basis.  It is also undisputed that they include:  Amtrak trains that run north and south between major cities along the eastern seaboard; the Long Island Railroad, which provides service to all of Long Island; New Jersey Transit rail lines servicing New Jersey and other regions; and the Seventh and Eighth Avenue New York City subway lines.  This fact supports Plaintiffs contention that the area where Plaintiffs were arrested is suitable for the protected activity in which they were engaged.

11.     It is undisputed that up to 600,000 riders enter Penn Station each day.  Again, this fact supports Plaintiffs' contention that the area around MSG and Penn Station can handle large numbers of people, including those desiring to engage in expressive activity without incident.

12.     It is undisputed, as Defendants claim, that from a security and policing standpoint MSG and Penn Station offered unique challenges and vulnerabilities.  Plaintiffs dispute that these challenges justified a blanket prohibition on expressive activities at the location where Plaintiffs were arrested.

13.     It is undisputed that the NYPD held the opinion that New York City (City) would see a volume of protest activity not seen in decades; however, this is not a material fact in this case because the Plaintiffs were not part of a large group of protestors nor was the City's purported "no standing" policy limited to large groups of protestors.

14.     It is undisputed that NYPD claims to have had information that potentially hundreds of thousands of protesters would come to the City to protest at the RNC.

15.     It is undisputed that Defendants testified that Organizers of the United for Peace and Justice anti-war march *predicted* that 250,000 people would participate in their march and

3

rally; however, this is not a material fact in this case because there is no evidence that this march was predicted to take place on the sidewalk where the Plaintiffs were arrested.

16.     It is undisputed that the NYPD anticipated that individuals with opposing viewpoints would seek to express their messages.

17.     It is undisputed that the NYPD expected that MSG would be the location for large-scale protests and demonstrations; however, this is not a material fact in this case because the Plaintiffs were not part of a large-scale protest.  Marcavage Dep. at 69:2-17.[2]

18.     Plaintiffs dispute the Defendants' claim that the City and the NYPD welcomed those seeking to exercise their First Amendment rights and sought to facilitate the exercise of those rights regardless of viewpoint.  Plaintiffs were told by several officers that their expressive activity was NOT welcome on the public sidewalk across the street from MSG.   In the communication between the Plaintiffs and police officers, Officer Kenji Ebanks ridiculed the Plaintiffs' demonstrative sign and told them they had to leave the area.[3]  *See* Leist Decl. at Ex. P (Audio Recording).  Numerous officers told the Plaintiffs that they could not be in the sight and sound of the RNC and directed them to the so-called "demonstration area" because "that's where all you guys go."  *See* Leist Decl. at Ex. P (Audio Recording).  And after Mr. Marcavage expressed his discomfort with the instruction to leave the area, both Plaintiffs were arrested.  *See* Leist Decl. at Ex. P (Audio Recording).  Captain Gerald Staples, a defendant in this case, testified that the entrance of the RNC could not be seen from the "demonstration area" and the demonstrators could not be heard without amplification by attendees.  Staples Dep. at 49:6, 49:7-

---

[2] A copy of the Marcavage deposition transcript is attached to the Leist Declaration at Exhibit F.
[3] A copy of the audio recording made by the Plaintiffs during the interaction between the Plaintiffs and NYPD is attached to the Leist Declaration as Exhibit P.  Plaintiffs stipulate to this recording as being a true and accurate copy of that recording.

15.[4]   Sergeant Richard Crespo testified that "if people wanted to demonstrate regarding this RNC, there was an area for it."  Crespo Dep. at. 68:6-13.[5]  In contrast, Chief Smolka testified that the "demonstration area" was within the sight and sound of MSG.  *See* Raum Decl. at Ex. D (Smolka Dep. January 11, 2007 at 413:5-9).  Thus, whether the "demonstration area" is within sight and sound of Plaintiffs' intended audience is a disputed issue of material fact.

19.   Plaintiffs dispute that the City's "demonstration area" facilitated expressive activity when it forced all expressive activity in and around the MSG area to 31st Street and 8th Avenue.  The "demonstration area" was in an area where attendees of the RNC could not see or hear the Plaintiffs' expressive activity.  Staples Dep. at 49:6, 49:7-15.

20.   It is undisputed that the Defendants created a "demonstration area" at 8th Avenue and 31st Street and that it extended south on 8th Avenue – progressively farther from the RNC attendees.

21.   It is undisputed that several events were planned during the week of the RNC in this "demonstration area"; however, this is not a material fact in this case because Plaintiffs did not seek to engage in expressive activity in the "demonstration area" or as part of an "event."

22.   It is undisputed that the NYPD issued a number of sound permits for these events and also arranged for the placement of a stage at the northern end of the "demonstration area" for any group that chose to use it during an event or protest; however, this is not a material fact in this case because a permit is not constitutionally required for two individuals to engage in peaceful expressive activity on a public sidewalk.

---

[4] A copy of the Staples deposition transcript is attached to the Leist Declaration at Exhibit I.

[5] A copy of the Crespo deposition transcript is attached to the Leist Declaration at Exhibit J.

23.     It is undisputed that the Defendants created a "demonstration area" and it is also undisputed that the Defendants sent persons wishing to engage in expressive activity during the RNC to that "demonstration area."

24.     It is undisputed that several thousand individuals who had previously not applied for or requested a parade permit were escorted by NYPD from Dag Hammerskold Plaza near the United Nations across Manhattan and into the "demonstration area;" however, this is not a material fact in this case because the Plaintiffs were not participating in a "parade" at the time of their arrests.

25.     It is undisputed that to create the "demonstration area" at that location, the NYPD blocked off vehicle traffic on 8th Avenue (a main vehicle thoroughfare) in midtown.

26.     It is undisputed that the Defendants monitored the "demonstration area," and could expand it south on 8th Street

27.     It is undisputed that thousands of individuals used the "demonstration area" during the RNC.

28.     It is undisputed that the NYPD actively sought to assure that the "demonstration area" was safe for anyone who sought to engage in expressive activity, regardless of viewpoint; however, this is not a material fact in this case.

29.     It is undisputed that the "demonstration area" was monitored constantly by officers to assure that individuals assembled there could express themselves without concern that other individuals in the area (who may have had differing views) would retaliate or take other action against them; however, this is not a material fact in this case.

30.     It is undisputed that the NYPD believed that political conventions were potential terrorist targets and that it was necessary for them to prepare for the possibility of groups and

individuals who sought to engage in criminal conduct that could significantly endanger public safety.

31.     It is undisputed that MSG was the main venue for the RNC.  Plaintiffs do however, dispute Defendants' claim that increased pedestrian activity justified the creation of a "demonstration area" that prevented the Plaintiffs from engaging in expressive activity on a public sidewalk.  There is no evidence in the record that demonstrates that pedestrian traffic was any heavier during the RNC than any other day or any other comparable event at MSG.

32.     Plaintiffs dispute the Defendants' claim that the security measures taken in the vicinity of MSG, which included the relegation of expressive activity to the "demonstration area" were necessary to protect the President, Vice President, and other attendees of the RNC.  The record demonstrates that the sidewalk where the Plaintiffs desired to engage in expressive activity was open to the public without restriction other than the restriction of expressive activity. Ebanks Dep. at 26-27;[6] Gavin Dep. at 20-21. [7]

33.     It is undisputed that the Defendants believed that as many as 50,000 people were expected to participate during the RNC (over a four-day period), including:  approximately 2,509 delegates; 2,344 alternates; 15,000 members of the media/press; 15,000 donors, governors, congressional delegations and staff; and 15,000 family, friends and other RNC visitors.  MSG however, hosts large events on a regular basis and holds at most 19,763 per event.  This is the potential crowd for every basketball game played at MSG.  *See* Raum Decl. at ¶ 10.

34.     It us undisputed that the NYPD was responsible for ensuring the safety of the City's own citizens, its visitors, and its buildings and property, while at the same time

---

[6] A copy of the Ebanks deposition transcript is attached to the Leist Declaration at Exhibit M.

[7] A copy of the Gavin deposition transcript is attached to the Leist Declaration at Exhibit L.

minimizing inconvenience to commuters, businesses and residents in the vicinity of MSG.  But this is no different from the NYPD's responsibility to the City on every other day.  It is also material that the City has a duty to uphold and protect the constitutional rights of its residents and visitors.

35.     It is undisputed that the NYPD implemented a series of security zones around MSG that allowed for control of ingress and egress as well as the quick closure of the area in the event of a catastrophic incident.  It is disputed, however, that the perimeters of the security zones were well known to the officers patrolling the area around MSG.  Mr. Smolka described the "frozen zone" as the area along the western sidewalk of 7th Avenue between 31st Street and 33rd.  Smolka Decl. at 4-5:13.[8]  Officer Ebanks told Mr. Marcavage and Mr. Lefemine that the eastern sidewalk of 7th Avenue between 31st Street and 33rd was a "frozen zone."  *See* Leist Decl. at Ex. P (Audio Recording); Marcavage Dep. at 91:16-21.  Captain Staples testified that he did not know what areas outside of MSG were considered a "frozen zone," (Staples Dep. at 46:4), but that the eastern side of 7th Avenue between 32nd and 33rd Street was not a "frozen zone" on September 4, 2001.  Staples Dep. at 46:7.  Several of the officers testified that the areas outside of the "frozen zone" had heightened security restrictions, as a secondary or lower level "frozen zone."  Crespo Dep. at 59:7.  Officer Chris Serrao testified that his post on the eastern side of 7th Avenue between 32nd Street and 33rd Street (Serrao Dep. at 10:22-25[9]) "was an extended area of the frozen zones."  Serrao Dep. at. 23:16.

36.     It is undisputed that pedestrian traffic both within and in the vicinity outside MSG was restricted in various ways.  It is important to note that pedestrian traffic was not restricted on the sidewalk along the eastern side on 7th Avenue between 33rd and 32nd Streets.  In fact,

_____

[8] A copy of the Smolka declaration is attached to the Leist Declaration at Exhibit E.
[9] A copy of the Serrao deposition transcript is attached to the Leist Declaration at Exhibit K.

pedestrian traffic was expanded in the area where Plaintiffs were arrested because 32nd Street was closed to vehicular traffic and dedicated to pedestrian traffic.  Donnelly Dep. at 13:8-12.[10] Moreover, 7th Avenue was closed to vehicular traffic so pedestrians crossing 7th Avenue from 32nd Street who were coming and going from MSG and Penn Station were not impeded by vehicular traffic.  Staples Dep. at 53:19-21.

37.    It is undisputed that two of the entrances to Penn Station (at 31st Street and 8th Avenue and at 33rd Street and 8th Avenue) were closed in their entirety.  It is important to note that there was also an additional entrance to Penn Station on 34th Street.  *See* Raum Decl. at Ex. E (Map of Penn Station).

38.    It is undisputed that the NYPD implemented a "frozen zone" that prohibited pedestrian traffic on the west sidewalk of 7th Avenue between 31st Street and 33rd Street.  There was however, no known boundary to the "frozen zone" outside of MSG and no known security standard among NYPD officers for the "frozen zone."  *See* ¶ 35 above.

39.    It is undisputed that barriers were erected along the 7th Avenue curb line, on the west side of the avenue, to assist enforcement of this prohibition; however, this is not a material fact in this case.

40.    Plaintiffs dispute that the NYPD implemented a "no-standing" policy on the east sidewalk of 7th Avenue between 31st and 33rd Streets.  Evidence in the record supports Plaintiffs' contention that the NYPD implemented a "no expressive activity" policy.  To support this fact, Plaintiffs refer the Court to paragraphs 19-29 above, which describes the Defendants creation of the "demonstration area."  Additionally, Officer Ebanks testified that the City did not have a distinct "no standing" policy for the area surrounding MSG during the RNC.  Ebanks

---

[10] A copy of the Donnelly deposition transcript is attached to the Leist Declaration at Exhibit N.

Dep. at 26-27.  NYPD officers assigned to the area around MSG on September 1, 2004, testified that all expressive activity was to take place in the "demonstration area" and not on the public sidewalk across from MSG.  Officer Crespo testified that "there was a designated area for people to demonstrate" and therefore the Plaintiffs could not engage in expressive activity on the sidewalk. Crespo Dep. at 68:6-14.  Officer Serrao testified that he instructed anyone wishing to protest that they needed to go to the demonstration area; "I just remember that they had signs and I told them if they want to, you know, stand around and protest, go to 31st and 8th."  Serrao Dep. at 71:18-20.  If someone was walking up and down the sidewalk with a sign, the officers were instructed to tell those people to go to the "demonstration area."  Serrao Dep. at 29: 21-25. Officer Dawn Gavin testified that "[t]he sidewalk was supposed to be kept free, and protestors were not supposed to be allowed to protest."  Gavin Dep. at 20:16-18.  Officer Brian Donnelly testified that there were certain areas for protestors.  Donnelly Dep. at 50:12-13.  And Officer Michelle Burke testified that she was instructed to order people engaged in expressive activity to the "demonstration area."  Burke Dep. at 57:16-23.[11]  Thus, the record demonstrates that anyone—whether stationary or moving—who engaged in expressive activity was not permitted on the sidewalk where Plaintiffs were arrested.  At his deposition, Chief Smolka testified that expressive activity was not permitted on the sidewalk along the east side of 7th Avenue.  *See* Raum Decl. at Ex. D (Smolka Dep. January 9, 2007 at 250-51.)

41.    Plaintiffs dispute Defendants' statement that pedestrians on the east side of 7th Avenue between 31st and 33rd Street were permitted to engage in expression so long as they continued moving and did not to congregate.  Plaintiffs were permitted to walk so long as they did not engage in free speech and if they did so they were told that their expressive activity

---

[11] A copy of the Burke deposition transcript is attached to the Leist Declaration at Exhibit O.

belonged in the "demonstration area" whether they were moving or stationary.  Marcavage Dep. at 86-87, 88:16-17; *See* ¶ 40 above.

42.     Plaintiffs dispute the Defendants' statement that the ostensible "no standing" (or the actual "no expressive activity") policy was required to keep the sidewalks free from congestion, promote the public safety, and minimize the inconvenience to commuters, businesses, and residents.  These safety and efficiency concerns were not unique to the RNC environment and do not support Defendants' blanket speech restriction uniquely applied to the RNC event.  Moreover, the City has more narrowly tailored laws to address such concerns, therefore this justification is disputed.

43.     It is undisputed that between 31st and 33rd Streets, pedestrians were not permitted to step into the street or to cross 7th Avenue, except at the intersection of 32nd Street and 7th Avenue.  It is important to note that it is illegal to cross the street except at designated intersections at all times in New York City.  New York City, N.Y., Rules, Tit. 34, § 4-04 (1998).

44.     It is undisputed that the Defendants placed barriers along the 7th Avenue curb line, on the east side of the avenue, to assist enforcement of this prohibition.

45.     It is undisputed that at the intersection of 7th Avenue and 32nd Street, a crosswalk remained open that allowed entry to and exit from MSG and Penn Station.

46.     It is undisputed that several subway lines also discharged passengers through exits at that intersection.

47.     Plaintiffs dispute the Defendants' testimony that at the crosswalk at 7th Avenue and 32nd Street, officers enforced a policy by which pedestrians were permitted to walk but were required to keep moving and not to congregate, when in fact, the Defendants' policy was that pedestrians were not permitted to engage in expressive activity at the intersection of 7th Avenue

and 32nd Street.  Officer Ebanks testified that the City did not have a special "no standing" policy for the area surrounding MSG during the RNC.  Ebanks Dep. at 26-27; *see also* Crespo Dep. at 68:6-14; Serrao Dep. at 71: 18-20; Gavin Dep. at 20:16-18, 20-21.  And Donnelly testified that there were certain areas for protestors.  Donnelly Dep. at 50:12-13.  Donnelly also testified that there was a specific place for pedestrians to protest, while standing on the sidewalk for other activity (for example, smoking a cigarette) was permitted.  Donnelly Dep. at 57:14-16. People were also not prevented from standing on the sidewalk and taking pictures.  Crespo Dep. at 43:4-7.

48.     It is undisputed that because of the various closures of ingress to and egress from Penn Station and MSG, and for the other reasons discussed above, the 32nd Street approach to Penn Station and MSG became the primary point of ingress to and egress from those facilities for thousands of pedestrians and commuters.  However, the closure to vehicle traffic of the portions of Seventh Avenue and 32nd Street in that area opened a much wider pedestrian expanse than is ordinarily available to such persons.  As indicated in paragraph 37, however, the 34th Street entrance to Penn Station remained open.

49.     It is undisputed that Defendants thought that it was critically important to keep that artery of pedestrian traffic, and the adjacent pedestrian walkways that served it, fully open and unimpeded.  There is no evidence, however, that Plaintiffs interfered with this objective.

50.     Plaintiffs do not dispute that the restrictions discussed above, including the disputed limitation on "standing" on the sidewalk of 7th Avenue between 31st and 33rd Streets, and "standing" in the crosswalk at 32nd Street, were implemented only during the period of the 2004 Convention.

**FACTS RELATED TO DEFENDANTS' ARREST OF THE PLAINTIFFS FOR ENGAGING IN EXPRESSIVE ACTIVITY IN A TRADITIONAL PUBLIC FORUM.**

51.     It is undisputed that the Mr. Marcavage and Mr. Lefemine are evangelical ministers from Pennsylvania and South Carolina respectively.

52.     It is undisputed that the Plaintiffs share the gospel of Jesus Christ and discuss abortion and homosexuality, along with any other topic that may arise, with passersby on public sidewalks, and that Mr. Marcavage characterized their ministry as "anti-sin."

53.     It is undisputed that Captain Staples retired as a Captain with the NYPD in 2006 after 26 years of service.

54.     It is undisputed that Captain Staples was employed by the NYPD for over 23 years, and had been a Captain for 7 years, on September 1, 2004.

55.     It is undisputed that on September 1, 2004, Captain Staples was assigned to patrol the perimeter of MSG and was responsible for the supervision of other officers in that area including officers responsible for security and crowd control.

56.     It is undisputed that Officer Crespo was assigned the southeast side of 7th Avenue between 31th and 32nd Streets during the 2004 RNC.

57.     It undisputed that Officer Serrao was assigned to work between 33rd and 32nd Streets on 7th Avenue.

58.     It is undisputed that Officer Gavin also was assigned to work on September 1, 2004.

59.     Plaintiffs dispute Defendants' testimony that the direction given to the NYPD in preparation for the 2004 RNC was limited to preventing pedestrians from blocking either vehicular or pedestrian traffic, when in fact the direction was that all expressive activity around MSG had to take place in the "demonstration area."  *See* ¶¶ 40 & 47 above.

13

60.     It is undisputed that the NYPD told officers that those wishing to exercise their First Amendment rights were to do so at a "demonstration area" or "free speech zone" at 31st Street and 8th Avenue.

61.     It is undisputed that the NYPD instructed officers to tell people who desired to engage in expressive activity that they could only do so in the "demonstration area" or "free speech zone" at 31st Street and 8th Avenue.

62.     Plaintiffs dispute the characterization of the eastern side of 7th Avenue between 32nd and 33rd Streets as an extended part of the "frozen zone."   There was no uniform understanding of the meaning of a "frozen zone," or "extended frozen zone," and even less of an understanding of the perimeters of any such zone on September 1, 2004, at that location. Therefore this is a jury question.   At his deposition, Chief Smolka was unable to define the boundaries of any secondary or outer perimeter surrounding MSG that required additional security.  He described the area generally as "[a] few blocks out in all directions."  *See* Decl. at Ex. D (Smolka Dep. January 11, 2007 at 365-367.)  Captain Staples described a "frozen zone" as an area that is completely off-limits to pedestrians, and permits only certain police officers. Staples Dep. at 45:14-16.  He had no recollection of the perimeters of a "frozen zone" outside of MSG.  *Id.*  And Captain Staples testified that the eastern side of 7th Avenue between 32nd Street and 33rd Street was not a "frozen zone."   Staples Dep. at 46:7.   In contrast, Officer Serrao testified that the area in question was an "extended frozen zone."  Serrao Dep. at 23:21.  Officer Crespo testified that there were "definitely written policies" defining and explaining the scope of a "frozen zone."[12]  Crespo Dep. at 59:11-12.  And lastly, Officer Gavin testified that "frozen zones" will have varying levels of security depending on the circumstances.  Gavin Dep. at 25.

_____

[12] Plaintiffs asked for the "written polices" but none have been produced.  Crespo Dep. at 59:13-15.

No written documents detailing the security level of any "frozen zone" has been produced in discovery of this case.[13]   Moreover, Defendants counsel has conceded that no such written document describing the purported "no standing" policy exists.  *See* Raum Decl. at ¶ 9.

63.     Plaintiffs dispute the Defendants' characterization of the security measures implemented on the east side of 7th Avenue between 32nd and 33rd Streets and their purported justification. *See* ¶ 62.

64.     Plaintiffs dispute Defendants' testimony that the NYPD instructed its officers that pedestrians were not permitted to stop on the sidewalk between 32nd and 33rd Streets along the east side of 7th Avenue on September 1, 2004.  It was always the City's policy to maintain pedestrian traffic flow in that area, and a "no standing" rule is not required to effectuate that goal (particularly when ample space remains for pedestrian traffic apart from the stationary location of the speaker).   Officer Ebanks testified that the rules on September 1, 2004, regarding pedestrian traffic flow were not different on that day than on any other.  Ebanks Dep. at 27:10-19.  Plaintiffs contend that Defendants' policy was a no "expressive activity" policy as evidenced in the direction given the officers to send all demonstrators to the "demonstration area."  *See* ¶¶ 40, 41, 47, 50, 59, & 60 above.

65.     Plaintiffs dispute the Defendants testimony that officers were instructed that pedestrians could not stop because it could lead to a build-up of pedestrian traffic at that location. Officers were instructed that the sidewalks were to be kept free of protestors.  Gavin Dep. at 20: 16-18.  The City already had laws that prohibit anyone from blocking pedestrian traffic on sidewalks.  Ebanks Dep. at 26-27.

---

[13] Defendants have produced thousands of pages of records for discovery but failed to identify any document that identifies a "no standing" policy application to the east sidewalk of 7th Avenue during the RNC.

66.     It is undisputed that the Defendants instructed officers to arrest anyone who did not comply with their orders to leave the area around MSG.

67.     It is undisputed that Mr. Marcavage and Mr. Lefemine had spent a few hours immediately prior to their arrival at MSG on Wednesday, September 1, 2004, sharing the gospel message in a park in the Greenwich Village neighborhood of Manhattan.

68.     It is undisputed that while sharing the gospel of Jesus Christ in the Greenwich Village Park, several people gathered around Mr. Marcavage and Mr. Lefemine to discuss the topic.

69.     It is undisputed that Mr. Marcavage and Mr. Lefemine remained in a public park discussing the gospel after a police officer asked them to leave.

70.     It is undisputed that Mr. Marcavage remained in the public park sharing the gospel of Jesus Christ after the police asked them to disperse.

71.     It is undisputed that Mr. Marcavage remained in the public park discussing the gospel with passersby before going to 7th Avenue and 33rd Street.  Plaintiffs add that Mr. Lefemine was engaged in expressive activity alongside Mr. Marcavage at this location. Lefemine Dep. at 101:25, 102:1-2.

**PLAINTIFFS AT THE MADISON SQUARE GARDEN LOCATION.**

72.     It is undisputed that on September 1, 2004, that the Plaintiffs were standing on the public sidewalk in front of the Pennsylvania Hotel, on the east side of 7th Avenue, between 32nd and 33rd Streets, across the street from MSG.  Plaintiffs add that they were standing on the northern end of the block running from 32nd to 33rd Streets on the east side of 7th Avenue, in close proximity to 33rd Street, and approximately forty feet north of the entrance to the Pennsylvania Hotel.  Lefemine Dep. at 127:15-16.  The entrance to MSG was even farther south

and on the opposite side of 7th Avenue, almost the length of an entire city block.  Pls' Exhibit A, MSG and Penn Station Map.

73.   It is undisputed that Mr. Marcavage and Mr. Lefemine were standing together and each carried a sign with him.  Plaintiffs dispute the characterization of the signs as "large."  The approximate dimensions of the signs were 4 feet by 6 feet; and 3 feet by 5 feet.

74.   It is undisputed that Mr. Marcavage and Mr. Lefemine stood in that location for between 10 and 15 minutes before being approached by officers.

75.   It is undisputed that Captain Staples testified that he was on duty that morning to monitor the traffic in that area.

76.   It is undisputed that Captain Staples observed a large number of pedestrians coming from Penn Station and crossing from the western end of 7th Avenue to continue east bound on 32nd Street.

77.   It is undisputed that there were hundreds or maybe even thousands of people walking up and down the sidewalk in the vicinity of Mr. Marcavage and Mr. Lefemine.

78.   Plaintiffs dispute that the area in front of the Pennsylvania Hotel, was part of the exit to Penn Station and part of the exit out of the subway system on that day.  Captain Staples testified that the intersection of 7th Avenue and 32nd Street was part of the Penn Station exit.  Staples Dep. at 87-88.  The Pennsylvania Hotel was on the northern end of 7th Avenue between 32rd and 33rd Streets.  Marcavage Dep. at 79:24-25.

79.   It is undisputed that there were a large number of pedestrians in the area around MSG where the Plaintiffs wished to engage in expressive activity.

80.   Plaintiffs dispute that there were a higher number of people than normal walking in the area that was typically "a major pedestrian thoroughfare."  There is no evidence in the

record that the pedestrian traffic was more populous than "normal" at the time of Plaintiffs' arrests.

81.     It is undisputed that Mr. Marcavage and Mr. Lefemine were attempting to engage in expressive activity.

82.     It is undisputed that Mr. Marcavage and Mr. Lefemine carried literature and a tape recorder.

83.     It is undisputed that Mr. Marcavage and Mr. Lefemine may have offered literature to passersby.

84.     It is undisputed that Mr. Marcavage and Mr. Lefemine intended to engage the passersby in conversation at that location.  And it is also undisputed that Mr. Marcavage and Mr. Lefemine particularly wanted to discuss God's view on life and death.

85.     It is undisputed that Mr. Marcavage and Mr. Lefemine did not recall any other person engaged in expressive activity on 7th Avenue between 33rd and 32nd Streets.

### DEFENDANTS UNLAWFUL ARREST OF PLAINTIFFS.

86.     It is undisputed that the NYPD approached Mr. Marcavage and Mr. Lefemine while they were engaged in expressive activity and advised them that they were in a "frozen zone" and told them that they had to leave.

87.     It is undisputed that when Officer Serrao first observed the Plaintiffs, they were closer to the curb along 7th Avenue, speaking with other officers; however, this is not a material fact in this case.  It is relevant that Officer Serrao did not see them in their original position when they were first approached by the police, at which time they were standing very close to the building, out of the flow of pedestrian traffic.  Serrao Dep. at 31; Lefemine Dep. at 127:15-16.

88.     It is undisputed that Officer Serrao overheard the conversation between Mr. Marcavage and Mr. Lefemine and the other officers.  Plaintiffs, however, dispute the testimony that they were not complying with orders.  Plaintiffs began walking with the officers who told them that they had to go to the "demonstration area" and they continued to discuss the order with the NYPD officers to clarify what they had been told.  Marcavage Dep. at 104-105, 109-110.

89.     It is undisputed that Officer Serrao told Plaintiffs that they were not allowed to stand on the public sidewalk.  The order, however, was made while the Plaintiffs were attempting to engage in expressive activity on a public sidewalk and immediately after another officer had ridiculed their sign, saying "[a]re you kidding me with this?" and then ordered that they leave the area. *See* Leist Decl. at Ex. P (Audio Recording).  Plaintiffs add that when they were approached by the officers they were standing on a public sidewalk, out of the flow of pedestrian traffic peacefully engaged in expressive activity.  Marcavage Dep. at 80:22-24.

90.     It is undisputed that Officer Serrao identified his voice on the audio recording saying: "There's a Sergeant right here", "You guys got to go" and "You can't stay here."

91.     It is undisputed Mr. Marcavage and Mr. Lefemine twice sought to "appeal" the officers' orders to leave the public sidewalk to other members of the NYPD and the officers twice assented to those requests.  Plaintiffs maintain, however, that the orders were unlawful.

92.     It is undisputed that Mr. Marcavage and Mr. Lefemine appealed the order to leave the public sidewalk to a higher ranking officer.

93.     It is undisputed that the Plaintiffs will appeal demands to leave public sidewalks when they believe it to be unconstitutional.

94.     It is undisputed that Mr. Marcavage and Mr. Lefemine walked with several officers, including Officer Ebanks, to the southeast corner of 32nd Street and 7th Avenue, while discussing their direction that all expressive activity must take place in the "demonstration area."

95.     It is undisputed that Officer Ebanks told Mr. Marcavage and Mr. Lefemine that they had to leave and that their expressive activities were restricted to a "free speech zone" approximately one block west and two blocks south (31th Street and 8th Avenue) of where they had been standing.

96.     Plaintiffs dispute the Defendants' claim that MSG directly abutted the "demonstration area" at the corner of 31st Street and 8th Avenue.  *See* Raum Decl. at Ex. A (MSG and Penn Station map.)  Mr. Marcavage and Mr. Lefemine were told by several officers that the attendees of the RNC could not hear or see them from the "demonstration area."  *See* ¶ 18 above.  Moreover, the entrances to MSG were closed at the corner of 31st Street and 8th Avenue, and 33rd Street and 8th Avenue, therefore no one entered MSG in the vicinity of the "demonstration area."  *See* ¶ 37 above.  This, of course, is precisely why the "demonstration area" was located there.

97.     Plaintiffs dispute Defendants' contention that the "demonstration area" was within the sight and sound of MSG.  *See* ¶¶ 18, 37 above.

98.     It is undisputed that Officer Ebanks told Mr. Marcavage and Mr. Lefemine to leave the area and that they understood this direction.

99.     It is undisputed that Mr. Marcavage and Mr. Lefemine objected to being told that their expressive activity could only take place in the "free speech zone."

100.    It is undisputed that the Plaintiffs asked Officer Ebanks, "So what do you think about the First Amendment being just trampled because of these particular things that you call frozen zones?  Do you have any comment on that?"

101.    It is undisputed that the Plaintiffs objected to being told where and with whom they could engage in expressive activity.

### INTERACTION BETWEEN PLAINTIFFS AND CAPTAIN STAPLES.

102.    It is undisputed that Captain Staples observed Mr. Marcavage and Mr. Lefemine walking down the street.

103.    It undisputed that Officer Crespo testified that he first observed the Plaintiffs in the middle or closer to the crosswalk on the southeast corner of 32nd Street and 7th Avenue.  Mr. Marcavage and Mr. Lefemine were standing there because this is where Captain Staples was standing and they were engaged in a conversation with him.  Marcavage Dep. at 35:17-20.

104.    It is undisputed that Captain Staples observed Mr. Marcavage and Mr. Lefemine standing on a corner while holding their signs.  (They were speaking with police officers at the time.)  Plaintiffs dispute Defendants' claim that they were blocking pedestrian traffic on the southeast corner of 32th Street and 7th Avenue.  Mr. Marcavage and Mr. Lefemine were standing on a sidewalk that was approximately 25-30 feet wide.  Staples Dep. at 55:20-23; *See* Raum Decl. at Ex. B (32nd Street photograph).  32nd Street was closed to vehicle traffic, making the entire street a pedestrian walkway.  Staples Dep. at 68:5-23; *See* Raum Decl. at Ex. C (Photograph of the intersection of 7th Avenue and 32nd Street).  Mr. Lefemine testified that the area where the Plaintiffs were standing with the officers was "a very wide area" and that "there [was] no effectual interference with pedestrian traffic by a small group . . . including myself and Michael and the other officers that were present."  Lefemine Dep. at 62:6-15.

21

105.     It is undisputed that Captain Staples observed the size of Mr. Marcavage and Mr. Lefemine's signs.

106.     It is undisputed that Captain Staples observed that Mr. Marcavage and Mr. Lefemine were standing next to each other.

107.     Plaintiffs dispute the Defendants' characterization of Captain Staples' explanation of the Plaintiffs' position on the sidewalk corner as meaning that "there was no other way for people to leave that area" other than to pass by where they were standing.  The Plaintiffs were standing on one corner of a 25-30 foot wide sidewalk talking with police officers next to a city street that was closed to vehicle traffic and used that day as a pedestrian walkway.  *See* ¶ 104 above.   There is no evidence other than Caption Staples' unsupported testimony that any pedestrian traffic was obstructed. Plaintiffs' testimony along with the actual dimensions of the street and sidewalks surrounding the alleged obstruction create a distinct issue of fact in this regard.

108.     Plaintiffs dispute the Defendants' statement that they were impeding pedestrian traffic while talking with the officers immediately before their arrest.  *See* ¶ 104 above.

109.     Plaintiffs dispute Defendants' claim that Captain Staples determined that Mr. Marcavage and Mr. Lefemine were violating the "no standing" rule and blocking pedestrian traffic.  Captain Staples testified that the area where the Plaintiffs were arrested had "a large flow of traffic coming out of Penn Station from the west side of 7th Avenue, eastbound on 32nd" Staples Dep. at 54:8-9 and that they were standing on a 25-30 foot wide sidewalk.  Staples Dep. at 55:20-23.

110.     Plaintiffs dispute the Defendants' claim that Community Affairs Officers told Captain Staples that the Plaintiffs would not leave.  In his testimony, Staples does not claim that

any specific person informed him that the Plaintiffs were refusing an order to leave.  Staples testified that he informed the Plaintiffs that they could not stay on the corner of 31st Street and 7th Avenue because they were blocking pedestrians at that location.  Staples Dep. at 54:8-9. Plaintiffs had moved to that location in order to comply with an earlier instruction given to them by Officer Ebanks that they had to leave the area in front of the Pennsylvania Hotel.  Marcavage Dep. at 87:4-7.  Additionally, Captain Staples did not know where the Plaintiffs had come from prior to viewing them walking southward toward him on the sidewalk.  Staples Dep. at 65:19-21.

111.    Plaintiffs dispute the Defendants' claim that Captain Staples observed the Plaintiffs being provided numerous warnings and ample opportunity to disperse.  *See* ¶¶ 109-110.

112.    It is undisputed that Captain Staples approached the Plaintiffs and was within conversational range of them.

113.    It is undisputed that Captain Staples affirmed the orders of the other officers and repeatedly directed the plaintiffs to leave the area, however, Plaintiffs dispute the characterization of the sidewalk as a "restricted zone."  Officer Ebanks testified that the rules on September 1, 2004, on the sidewalk where the Plaintiffs were standing were not different on that day than on any other.  Ebanks, Dep. at 27:10-19.

114.    It is undisputed that Captain Staples advised Mr. Marcavage and Mr. Lefemine that while they were standing with the officers they were "blocking traffic with the sign."

115.    Plaintiffs dispute the Defendants' claim that Captain Staples informed them that he could arrest them if they did not leave the area where they were talking with the other officers.  In the recording of the conversion between Mr. Marcavage and Mr. Lefemine and Captain Staples, he never tells the Plaintiffs that they will be arrested if they do not leave,

Captain Staples just orders their arrest when asked if they were being threatened with arrest.  *See* Leist Decl. at Ex. P (Audio Recording).

116.    It is undisputed that the Plaintiffs could hear Captain Staples speaking to them on the sidewalk.  It is disputed, however, whether Mr. Marcavage and Mr. Lefemine were actually blocking pedestrian traffic.  *See* ¶¶ 104 & 109 above.

117.    Plaintiffs dispute the Defendants' claim that three officers ordered them to leave the "restricted zone" both before and after permitting them to appeal the order to a higher ranking officer.  Immediately after the Plaintiffs were told to leave, they complied with the request and began walking with the officers toward the "demonstration area."  Marcavage Dep. at 112:24-25.  The dialogue with the officers continued as the Plaintiffs walked south down the sidewalk on the east side of Seventh Avenue.  Marcavage Dep. at 109:22-25, 110:1-2.  When they encountered Captain Staples, Mr. Marcavage and Mr. Lefemine asked him to identify the law that they were violating by their expressive activity.  Not one of the officers involved identified any specific law that Mr. Marcavage and Mr. Lefemine were violating by their expressive activity.  *See* Leist Decl. at Ex. P (Audio Recording).

118.    It is undisputed that Captain Staples told Mr. Marcavage and Mr. Lefemine that their expressive activity belonged in the "demonstration area."

**DEFENDANTS ORDERS TO PLAINTIFFS REGARDING THEIR EXPRESSIVE ACTIVITY.**

119.    Plaintiffs dispute the Defendants' testimony that they were in a "restricted zone" and that they were repeatedly ordered to leave.  Plaintiffs dispute the classification of the public sidewalk that was open to the public in the same manner as it was every other day as "restricted" and when there was no uniform knowledge as to the security level of the so called "restricted area" where the Plaintiffs were engaging in expressive activity.  *See* ¶ 62 above.  Second, the

Plaintiffs were engaged in a conversation with the police officers regarding their expressive conduct.  Marcavage Dep. at 109:14-15.  During the course of that conversation, the Plaintiffs were attempting to clarify the Defendants' orders.  Marcavage Dep. at 110:7-12.

120.    It is undisputed that during the course of the dialogue between the Defendants and the Plaintiffs, that the Defendants told the Plaintiffs that they had to leave the sidewalk across the street from MSG, and north of its entrance, and that their expressive activity belonged in the "demonstration area."

121.    Plaintiffs dispute the Defendants' claim that they did not leave the area once the police ordered them to go to the "demonstration area."  Immediately after the Defendants ordered Mr. Marcavage and Mr. Lefemine to leave the area in front of MSG, they complied with the order and walked with the officers towards the "demonstration area."  Marcavage Dep. at 109:14-15.

122.    Plaintiffs dispute the Defendants' claim that Captain Staples personally observed that they made no movement to comply with the officers' previous orders.  Captain Staples testified that he did not know where Mr. Marcavage and Mr. Lefemine had been prior to the time that he saw them walking south on 7th Avenue.  Staples Dep. at 65:19-20.

123.    Plaintiffs dispute the Defendants' claim that Captain Staples had ample information to determine that the Plaintiffs had no intention to comply with the officers' orders.  *See* ¶ 122 above.

124.    Plaintiffs dispute the Defendants' claim that Mr. Marcavage did not intend to comply with the officers' orders but merely intended to continue a discussion with them.  The recorded evidence clearly indicates that Mr. Marcavage intended to comply with the officers orders to leave and that both Plaintiffs did comply.  Marcavage Dep. at 109:14-15.  As soon as

the officers told them to leave, the Plaintiffs began walking with the officers towards the "demonstration area."   Marcavage Dep. at 109:14-15.   Plaintiffs did continue to discuss the officers' orders, but they never refused them or intended to do so.  Indeed, it is undisputed that it was in the company of and in conversation with police officers that Plaintiffs (as ordered by the officers) left their post near 33rd Street and walked south until approaching Captain Staples on the southeast corner of 32nd Street and Seventh Avenue.

125.    It is undisputed that Mr. Marcavage and Mr. Lefemine continued to discuss the situation with the police officers.

126.    It is undisputed that the Mr. Lefemine wanted to discuss the situation with the officers who ordered the Plaintiffs to leave the area.

127.    It is undisputed that Mr. Lefemine asked Captain Staples if he was threatening them with arrest.

128.    Plaintiffs dispute the Defendants' claim that they could have left after they were told that they were blocking pedestrian traffic.  Captain Staples told the Plaintiffs that they had to leave the area and when they asked him to identify the law they were violating, Captain Staples replied "[r]ight now you're blocking pedestrian traffic with this sign.  And I'm taking you two away."  *See* Leist Decl. at Ex. P (Audio Recording).  Captain Staples then ordered their arrest. *See* Leist Decl. at Ex. P (Audio Recording).

129.    It is undisputed that Mr. Lefemine did not leave the area while he was in a discussion with the officers who were themselves stationary at the time of the conversation.

### DEFENDANTS' ARREST OF PLAINTIFFS.

130.    It is undisputed that Captain Staples ordered the arrests of Mr. Marcavage and Mr. Lefemine.

131.    It is undisputed that Mr. Marcavage and Mr. Lefemine did not intend to be arrested.

132.    It is undisputed that Captain Staples twice said "I'm sorry" to Mr. Marcavage and Mr. Lefemine for ordering their arrest.  Plaintiffs dispute that Captain Staples was apologizing for his unlawful actions.

133.    It is undisputed that Officers Crespo and Donnelly assisted in the Plaintiffs arrest.

134.    It is undisputed that Captain Staples observed Mr. Marcavage sit down when he was arrested.

135.    Plaintiffs dispute the Defendants' claim that Mr. Marcavage resisted arrest.  Mr. Marcavage did not resist the officers placing the handcuffs on him and he did not attempt to struggle against them or try to get away from them when the police placed handcuffs on him.  Marcavage Dep. at 125:24, 26:1-4.  Officer Donnelly was also present during the arrest and testified that Mr. Marcavage did not resist arrest.  Donnelly Dep. at 66:2-7.

136.    Plaintiffs dispute the Defendants' claim that Mr. Marcavage had to be lifted off of the ground.  Mr. Marcavage testified that he stood up and voluntarily walked to the police van.  Marcavage Dep. at 122:4.

137.    It is undisputed that Captain Staples was not involved in any other arrests during the 2004 RNC; however, this is not a material fact in this case.

138.    It is undisputed that Mr. Lefemine has been arrested for engaging in expressive activity on public sidewalks prior to his arrest on September 1, 2004; however, this is not a material fact in this case, and is inadmissible under Federal Rules of Evidence 402 and 404 or any other applicable rule of evidence.

139.     Plaintiffs dispute the characterization of Mr. Lefemine's testimony that he had been convicted of obstructing government administration in New York.  He testified that he had been charged with obstructing government administration because he was involved in a sit-in at an abortion clinic that shared a parking lot with a post-office; however, this is not a material fact in this case and is inadmissible under the Federal Rules of Evidence 402 and 404 or any other applicable rule of evidence.  Lefemine Dep. at 81-83.

140.     It is undisputed that Mr. Marcavage has been arrested for engaging in expressive activity on public sidewalks and has been convicted at least once, in connection with conduct substantially similar to the conduct in which he engaged on September 1, 2004; however, this is not a material fact in this case and it is inadmissible under the Federal Rules of Evidence 402 and 404 or any other applicable rule of evidence.

## FACTS RELATED TO CHARGES AND DISPOSITIONS.

141.     It is undisputed that the Defendants charged Mr. Marcavage with disorderly conduct and resisting arrest.

142.     It is undisputed that the charges against Mr. Marcavage were dismissed.

143.     It is undisputed that the Defendants charged Mr. Lefemine with disorderly conduct.

144.     It is undisputed that Mr. Lefemine accepted an adjournment in contemplation of dismissal.

## FACTS RELATED TO FIRST AMENDMENT, EQUAL PROTECTION AND OTHER ISSUES.

145.     It is undisputed that the Plaintiffs could not recall any other individuals who were standing in that area; nor any other individuals ministering in that area; nor any individuals protesting or demonstrating in that area; nor any other individuals carrying signs in that area.

Police officers did testify, however, that others could stand and take pictures as well as smoke cigarettes.  Crespo Dep. at 43:4-7; Donnelly Dep. at 57:14-16.

146.    It is undisputed that Mr. Marcavage testified that at the time of his arrest, he was unaware of the law he was accused of violating.

147.    Plaintiffs dispute the Defendants' characterization of Mr. Marcavage's testimony that he could not recall whether any of the officers said anything "pertaining to the contents of [plaintiffs'] speech."  Mr. Marcavage testified that the Defendants made derogatory comments regarding the sign that he was displaying, asking if he "was kidding."  Marcavage Dep. at 160; *See* Leist Decl. at Ex. P (Audio Recording).

148.    It is undisputed that Mr. Lefemine could not recall whether any officers made any remarks about the content of his speech.

149.    It is undisputed that both Plaintiffs have continued to exercise their First Amendment rights since their arrests on September 1, 2004.

150.    It is undisputed that Mr. Marcavage was arrested again in October 2004, October 2005, and July 2006 while exercising his First Amendment rights; however, this is not a material fact in this case and is inadmissible under the Federal Rules of Evidence 402 and 404 or any other applicable rule of evidence.

151.    It is undisputed that Mr. LeFemine has been ministering on the sidewalk three or four times per week since 2004.

152.    It is undisputed that Plaintiffs objected to being told where and with whom they could engage in expressive activity on a public sidewalk.

153.    It is undisputed that neither Plaintiff sustained any physical injury and neither plaintiff was treated for any emotional distress in connection with the incidents of which they

complain in this case.   Plaintiffs did testify however, that they suffered over thirty-two emotionally and physically draining hours in jail, during which they were degraded, disrespected, insulted, and abused.  Marcavage Dep. at 12:2-5; Lefemine Dep. at 14:7-15.

154.    It is undisputed that the audio recording submitted to the Court as Exhibit P accurately represents what was said during the incident; however, the Plaintiffs dispute the Defendants' claim that Defendants' Exhibit Q is an accurate transcript.

### ADDITIONAL MATERIAL FACTS:

### PLAINTIFFS' EXPRESSIVE ACTIVITY.

155.    Mr. Marcavage and Mr. Lefemine traveled to the City on September 1, 2004, in order to share the Gospel of Jesus Christ and a prolife message with attendees of the RNC. Lefemine Dep. at 117:5-10; Marcavage Dep. 61-62.

156.    When Mr. Marcavage and Mr. Lefemine arrived at 7th Avenue and 33rd Street, they were standing outside of the flow of the pedestrian traffic with their backs to the wall of the Pennsylvania Hotel holding their signs.  Marcavage Dep. at 81:1-4.

157.    Hundreds of people walked by Mr. Marcavage and Mr. Lefemine while they were standing on 7th Avenue and 33rd Street.  Marcavage Dep. at 84:17-19.

158.    While in this position, not one person asked them to move or even said "excuse me" to them.  Marcavage Dep. at 83:8-14.

159.    The police first approached Mr. Marcavage and Mr. Lefemine while they were standing in this position, close to the building and out of the way of pedestrian traffic, and told them to go to the "demonstration area."  Marcavage Dep. at 83:3-7.

## DEFENDANTS' UNLAWFUL ARREST OF PLAINTIFFS.

160.     After Mr. Marcavage and Mr. Lefemine had been told to leave the place they were standing on the public sidewalk, they complied by walking south on 7th Avenue, while at the same time lawfully inquiring as to the legal basis for the order to leave.  Lefemine Dep. at 171:15-18.

161.     Captain Staples was trained in First Amendment issues during his academy training.  Staples Dep. at 22-23.

162.     Captain Staples first saw the Plaintiffs walking south on 7th Avenue north of 32nd Street.  Staples Dep. at 54:17-19.

163.     Captain Staples next saw the Plaintiffs engaged in a conversation with the other officers on the southeast corner of 7th Avenue and 32nd Street.  Staples Dep. at 62:4-5, 63:2-3.

164.     When Captain Staples saw Mr. Marcavage and Mr. Lefemine engaged in a conversation with the officers at the south east corner of 7th Avenue and 32nd Street, they were stopped at that location because that is where the officers chose to stop.  Lefemine Dep. at 175:7-10.

165.     Mr. Marcavage felt uncomfortable with the officers' direction that he and Plaintiff Lefemine could not engage in expressive activity on the public sidewalk.  *See* Leist Decl. at Ex. P (Audio Recording); Marcavage Dep. at 97:12-14.

166.     When Mr. Marcavage saw Defendant Captain Staples, he attempted to discuss the situation with him.  Marcavage Dep. at 97:12-14.

167.     Captain Staples approached Mr. Marcavage and Mr. Lefemine while they were talking to the other officers.  Staples Dep. at 62:4-5.

168.     Captain Staples refused to answer any questions, he said "You have to leave this area now.  You have to leave this area now."  *See* Leist Decl. at Ex. P (Audio Recording).

169.     Mr. Marcavage asked him to identify the law that they were violating and Captain Staples replied, "You have to leave," and then said that they were blocking pedestrian traffic and immediately following that statement said, "And I'm taking you two away."  *See* Leist Decl. at Ex. P (Audio Recording).

170.     Chief Smolka testified that if the sidewalk was wide enough to accommodate other pedestrians, then several people walking on a sidewalk would not violate the disorderly conduct statute.  *See* Raum Decl. at Ex. D (Smolka Dep. January 25, 2007 at 111:9-21).

### MADISON SQUARE GARDEN IS ALWAYS BUSY.

171.     The City boasted that over 60,000 people attended the RNC over the four day period.  That attendance figure would bring the daily average attendance at the RNC to 15,000 people per day, which is less than the full capacity attendance at a basketball game.  *See* Raum Decl. at ¶10.

### THE CITY HAS EXISTING LAWS THAT PROHIBIT BLOCKING PEDESTRIAN TRAFFIC.

172.     New York State already has a disorderly conduct statute that prohibits pedestrians from obstructing pedestrian traffic with "intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," and did not need to create a "no standing" policy to ensure that pedestrian traffic on the public streets did not become congested.  The Court may take judicial notice of New York Penal Law § 240.20(5) (1965).

Dated: January 26, 2009.

Respectfully submitted,


s/ Brian W. Raum
Brian W. Raum
Benjamin W. Bull**
ALLIANCE DEFENSE FUND
15100 N. 90th Street
Scottsdale, AZ 85260
Tel: (480) 444-0020
Fax: (480) 444-0028
email: braum@telladf.org

Jeffrey A. Shafer*
ALLIANCE DEFENSE FUND
801 G. Street NW, Suite 509
Washington, D.C. 20001
Tel: (202) 637-4610
Fax: (202)347-3622
email: jshafer@telladf.org

*   admitted pro hac vice
** Not admitted in this jurisdiction